**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RAKSHPAL ("BEN") DOGRA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-00548-SRC |
| | ) | |
| ROBERT GRIFFIN III, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Dated: March 19, 2020

Respectfully submitted,

**DOWD BENNETT LLP**

By: <u> /s/ John D. Comerford </u>
John D. Comerford, MO #60164MO
James B. Martin, MO #70219MO
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111
jcomerford@dowdbennett.com
jbmartin@dowdbennett.com

*Attorneys for Plaintiff Rakshpal ("Ben") Dogra*

# TABLE OF CONTENTS

Page

Table of Exhibits.................................................................................................................iii

Table of Authorities………………………………………………………………………iv

Introduction......................................................................................................................... 1

Argument ............................................................................................................................. 2

    A.  Disputed Issues of Material Fact Preclude Summary Judgment………………………..2

    B.  The Assignment from CAA to Dogra is Valid…………………………………………6

    C.  Dogra's Claim is Not Barred by the Statute of Limitations……………………………10

    D.  Griffin's Contract Defenses Fail………………………………………………….....16

    E.  Dogra Has Made a Submissible Claim for Breach of the Covenant of Good Faith and
        Fair Dealing……………………………………………………………………………22

    F.  Dogra Has Made a Submissible Claim for Unjust Enrichment in the Event the Oral
        Agreement is Found to Be Invalid and Unenforceable……………..………………23

Conclusion ........................................................................................................................ 25

**TABLE OF EXHIBITS**

| Exhibit No. | Description | Bates No. |
|:---:|:---|:---|
| 1 | Deposition of Mark Heligman | None |
| 2 | Marketing Representation Notice | RG000212 |
| 3 | Mark Heligman Text Messages | DOGRA_00537-538 |
| 4 | January 20, 2012 Email from Mark Heligman | CAA_DOGRA_000007-8 |
| 5 | November 8, 2017 Email from Craig Gant | RG000001 |
| 6 | April 10, 2018 Email from Robert Lattinville | RG000023-25 |
| 7 | April 27, 2018 Email from Craig Gant | RG000061-62 |
| 8 | July 18, 2018 Email from Robert Lattinville | RG000108-112 |
| 9 | October 4, 2018 Letter to Craig Gant | RG000135-136 |

# TABLE OF AUTHORITIES

Page

*Aly v. Hanzada for Imp. & Exp. Co., LTD*,
    864 F.3d 844 (8th Cir. 2017) ................................................... 21

*Am. Railcar Indus., Inc. v. Hartford Ins. Co. of Midwest*,
    2014 WL 346047 (E.D.Mo. Jan. 30, 2014) ............................ 10

*Anderson v. Stanley*,
    753 S.W.2d 98 (Mo. App. 1988) ...................................... 11, 14, 17, 18

*Bailey v. Hawthorn Bank*,
    382 S.W.3d 84 (Mo. App. 2012) ........................................... 21

*Bertelsen v. Channel Bio, LLC*,
    2017 WL 6059176 (E.D.Mo. Dec. 7, 2017) ............................ 3

*Boswell v. Panera Bread Company*,
    2016 WL 1161573 (E.D.Mo. 2016) ................................... 23, 24

*Citizens and Southern Nat. Bank v. Bruce*,
    420 F.Supp. 795 (D.C.Mo. 1976) ..................................... 9, 10

*Consol. Products Co. v. Blue Valley Creamery Co.*,
    97 F.2d 23 (8th Cir. 1938) ................................................... 24

*Crabb v. Mid-Am. Dairymen, Inc.*,
    735 S.W.2d  (Mo. banc 1987) ........................................... 21

*Dubinsky v. Mermart LLC*,
    2009 WL 1011503 (E.D.Mo. 2009) .................................... 23

*Essco Geometric v. Harvard Industries*,
    46 F.3d 718 (8th Cir. 1995) ............................................... 19

*Fry v. Accent Mktg. Services, L.L.C.*, 4:13CV59 CDP,
    2013 WL 2403669 (E.D.Mo. May 31, 2013) ...................... 20

*Grantham v. Wal-Mart Stores, Inc.*,
    2012 WL 12898187 (W.D.Mo. 2012) ................................. 20

*Green v. Boothe*,
    188 S.W.2d 84 (Mo. App. 1945) ..................................... 14, 15

iv

*Holt v. Story,*
 642 S.W.2d 394 (Mo. App. 1982) ....................................................... 22

*Howard Undertaking Co. v. Fidelity Life Ass'n,*
 59 S.W.2d 746 (Mo. App. 1933) ..................................................... 8, 9

*Howard v. Turnbull,*
 258 S.W.3d 73 (Mo. App. 2008) ...................................................... 23

*In re Express Scripts, Inc., PBM Litigation,*
 522 F.Supp.2d 1132 (E.D.Mo. 2007)................................................ 23

*Kimberlin v. C.M. Brown and Associates, Inc.,*
 722 S.W.2d 90 (Mo. App. 1986) ...................................................... 21

*Levine v. Zadro Products, Inc.,*
 2003 WL 21344550 (S.D.N.Y. 2003)............................................... 21

*Missouri Interstate Paper v. Gresham,*
 116 S.W.2d 228 (Mo. App. 1938) .................................................... 14

*Prime Aid Pharmacy Corp. v. Express Scripts, Inc.,*
 2017 WL 2021082 (E.D.Mo. 2017)................................................... 23

*Rangeline Capital, LLC v. Preston,*
 2018 WL 2321097 (E.D.Mo. May 22, 2018) .................................... 11

*Roeder v. Ferrell-Duncan Clinic, Inc.,*
 155 S.W.3d 76 (Mo. App. 2004) ............................................. 7, 8, 13

*Saal v. Mielke,*
 492 F.2d 1184 (8th Cir. 1974) .......................................................... 3

*State Auto Prop. & Cas. Ins. Co. v. Loehr,*
 2008 WL 4449449 (E.D.Mo. Sept. 26, 2008)................................... 21

*Sturgeon v. Allied Professionals Ins. Co.,*
 344 S.W.3d 205 (Mo. App. 2011) .................................................... 11

*Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.,*
 347 F.3d 1052 (8th Cir. 2003) ......................................................... 20

*Want v. Century Supply Co.,*
 508 S.W.2d 515 (Mo. App. 1974) .................................................... 21

*Wills v. Alcorn,*
   636 S.W.2d 142 (Mo. App. 1982) ........................................................................... 22

## STATUTES

R.S.Mo. § 432.010 ................................................................................................... 21

R.S.Mo. § 516.120 ................................................................................................... 10

## OTHER AUTHORITIES

54 C.J.S. Limitation of Actions § 264 (1987) ............................................................ 13

## Introduction

Defendant Robert Griffin III ("Griffin") has moved for summary judgment on all counts of the Complaint of Plaintiff Rakshpal ("Ben") Dogra ("Dogra").  Griffin's motion should be denied because, as Griffin repeatedly acknowledges throughout his Motion, there are genuine issues of material fact that must be decided by a jury.  Again and again, Griffin explains that Dogra "alleges" one thing and Griffin "contends" the exact opposite is true.  *See, e.g.,* Doc. 71 (Memo. of Law in Support of Motion for Summary Judgment) at 8 (explaining that "Dogra alleges the exact terms of the agreement" at issue are one thing ….. "However, Griffin contends CAA Sports' obligations under the agreement" are something entirely different).  A jury must decide these disputed issues of fact, as the terms of the oral agreement between CAA Sports ("CAA") and Griffin will be decided largely upon evidence of the parties' respective course of conduct and determinations of witness credibility.

Griffin does not dispute he entered into an oral agreement to pay 15% commissions to CAA ("the Agreement"). He does not dispute he received millions of dollars of revenue from Adidas, Gatorade, Nissan, Subway and other companies under deals negotiated by CAA pursuant to the terms of the Agreement.  He does not dispute he paid CAA the 15% commission in 2012 and 2013 on revenue he had received from these outside companies.  Griffin simply stopped paying the commissions in late 2014.  According to the documents he submitted with his Motion, Griffin currently owes over $700,000, which represents the 15% commission on over $4.9 million in endorsement and marketing revenues he received from February, 2014 through August, 2015. Doc. 71-25, at 3.

Griffin hired an attorney in 2017 to attempt to resolve the issue of how much he owed to CAA.  That attorney acknowledged that sums were owed and simply asserted he wanted to figure

out the exact amount.  In 2018, Griffin changed course and denied that any sums are owed.  This lawsuit followed.  This case is not complex, then, and had to be filed simply because Griffin now refuses to pay the commissions he owes.

### Argument

**A.      Disputed Issues of Material Fact Preclude Summary Judgment.**

Griffin and Dogra disagree on the scope and terms of the oral agreement at the heart of this case.  To grant Griffin's Motion would require the Court to assume that Griffin's version of the facts is true.  This is not possible on the record before the Court at summary judgment.  A jury should hear the evidence, assess the witnesses' credibility, and perform its role as the fact finder.

**1.      The parties dispute whether CAA was required to secure Griffin a book deal and make Griffin into a Hollywood movie star before CAA became entitled to endorsement and marketing commissions.**

First, Griffin does not deny that CAA did marketing and endorsement work for him and admits paying CAA a 15% commission for that work in 2012 and 2013.  Griffin does not dispute that CAA negotiated and presented him with contracts he entered into with Adidas, Nissan, Subway, Gatorade and other companies.  Instead of contesting these undeniable facts, Griffin argues he had no obligation to pay CAA for its work in bringing him marketing and endorsement deals if CAA did not *also* perform several other tasks to Griffin's satisfaction.  Memo. at 8.  These other "obligations" of CAA allegedly include, among many others, "negotiate book opportunities with publishers" and "foster Hollywood connections to create opportunities for him throughout career and post-career[.]"  *Id.*  Griffin claims he is entitled to summary judgment because CAA "had to perform" all of these tasks "in exchange for a 15% commission of his endorsement revenue[.]"  *Id.*  In other words, Griffin argues that even if CAA did the marketing work for which payment is being sought in this case, CAA's failure to do *other* work for Griffin relieves him of

2

the obligation to pay for the work CAA did do.  By contrast, Dogra alleges – and will prove at trial – that these other alleged "obligations" were not obligations at all, but rather were additional services that CAA offered to Griffin in an effort to convince him to enter into an *exclusive* marketing and endorsement agreement with CAA – something Griffin never did.

Because the parties disagree as to the terms of their oral agreement, a jury must decide which party's version of events is true.  *Bertelsen v. Channel Bio, LLC*, 2017 WL 6059176, at *4 (E.D.Mo. Dec. 7, 2017) ("Here, the record demonstrates genuine issues of material facts regarding the creation of and the terms of the alleged oral contract. ... The issue of contract formation in this case—whether the parties had a meeting of the minds regarding the terms—will turn on the credibility of the parties involved. Construed in a light most favorable to Plaintiff, the non-moving party, there are genuine issues of material fact that must be resolved by a jury."); *Saal v. Mielke*, 492 F.2d 1184, 1186 (8th Cir. 1974) ("The existence and terms of an oral lease agreement depend in this case upon the testimony of the parties to the alleged agreement. The appellant may not be denied his chance to test the credibility of that testimony before the proper triers of the fact. A genuine issue of a material fact is present in this case, precluding summary judgment.").

For purposes of deciding Griffin's motion for summary judgment, it should be sufficient to note that Griffin readily admits he paid 15% marketing commissions to CAA in the years 2012 and 2013.  Memo. at 5 ("for years, [Griffin] sent money from his California-based Morgan Stanley account to CAA Sports' bank account in California ……. Griffin paid CAA Sports $377,111.72 for 2012 marketing commissions and $582,501.64 for 2013."); Doc. 71-15 (showing as "paid" to CAA the sum of $377,111.72 for 2012 endorsement commission); Doc. 71-16 (showing as "paid" to CAA the sum of $582,501.64 for 2013 endorsement commissions).

Griffin paid these endorsement and marketing commissions to CAA even though CAA had not yet performed the alleged additional "obligations" that Griffin now claims CAA had to perform before triggering his obligation to pay. CAA had not, for example, secured a book deal with a publisher or made Griffin a Hollywood star throughout his career and post-career – and yet Griffin paid the 15% commissions anyway. This course of performance by Griffin strongly supports Dogra's position that the oral agreement was exactly what Dogra has alleged – a 15% commission was owed to CAA on all revenue Griffin received from endorsement and marketing deals negotiated for him by CAA whether or not CAA ever, for example, secured Griffin a book deal or made him into a Hollywood star during or after his playing career in the NFL. Indeed, Griffin's current marketing agent, Mark Heligman, testified that CAA's right to the 15% commission did _not_ depend on its ability to perform every service that was discussed with Griffin. Pltf's Ex. 1, Heligman Dep., 115:4-10 ("Q. Okay. But you agree with me that all the things on this list is what CAA agreed they would do for Robert in exchange for 15 percent commission on the fees he generated? A. I do not agree with that.").[1] Notably, Griffin did not attach any part of Heligman's deposition to his Motion for Summary Judgment. In virtually every respect, Heligman's testimony runs counter to Griffin's position in this case.[2]

A reasonable jury could (and should) conclude these services were not contractual "obligations" of CAA, but were, in fact, simply additional services that CAA would try to provide to Griffin or assist him with _if_ he signed an _exclusive_ marketing agreement with CAA, and if it

---

[1] The "list" referenced in this question from Griffin's counsel is the list of services contained in Heligman's declaration, which Griffin attached to his Motion. Doc. 71-8, ¶ 8.

[2] Mark Heligman did the marketing work for Griffin on behalf of CAA. Heligman left CAA in December, 2014 but, notably, he still works for Griffin as his marketing agent to this day. Pltf's Ex. 1, Heligman Dep., 69:8-17.

were even possible to do so.  Griffin's payment of the 15% commissions in 2012 and 2013 shows that his current argument has been made up after the fact in an attempt to avoid his previously recognized obligation.

>    **2.    The parties dispute whether Griffin agreed to pay CAA commissions  on  all revenue he received from the endorsement and marketing deals CAA negotiated and presented to him regardless of when the revenue was received.**

Second, Griffin and Dogra disagree about whether Griffin has an obligation to pay CAA 15% commissions on the marketing and endorsement revenues he collected after he terminated the oral agreement in December, 2014.  Memo. at 10 ("Because Griffin terminated CAA Sports in December 2014, he cannot be liable for any commissions based upon fees generated by him in 2015 and 2016.  Griffin was only paid for his endorsement work (for Adidas, Nissan, and Gatorade for instance) in 2015 and 2016 because he performed his contractual obligations to those third parties (filming commercials, making personal appearances, etc.) without assistance from CAA Sports.").  By contrast, Dogra alleges – and will prove at trial – that Griffin is obligated to pay the 15% commission on any earnings he received from endorsement and marketing deals that CAA negotiated and secured for Griffin prior to the termination of the agreement, regardless of when the revenue was eventually received by Griffin.  *See* Doc. 5, First Amended Complaint, ¶¶ 9-10.

A reasonable jury could find that Griffin's interpretation of the parties' oral agreement is untrue and Dogra's interpretation is correct.  Under Griffin's interpretation, he could have entered into the oral agreement with CAA, allowed CAA to negotiate and secure millions of dollars of endorsement and marketing deals for him (as CAA in fact did), and then Griffin could have *immediately* terminated the agreement with CAA and relieved himself of any obligation to pay CAA the 15% commission on the deals it had secured for Griffin's benefit – thereby saving himself

hundreds of thousands of dollars in commission payments.  This is not a reasonable interpretation of the parties' oral agreement.  A jury must decide which party is telling the truth.

Griffin readily admits that he paid CAA hundreds of thousands of dollars in marketing commissions throughout 2012 and 2013.  Memo. at 5; *see also* Griffin SUMF ¶¶ 22, 24.  He thus recognized through his actions that the parties had an enforceable oral agreement requiring him to pay CAA 15% commissions on revenues he received from endorsement and marketing deals that CAA has negotiated for him and put into place for his benefit.  He also admits that $376,828 of Dogra's current claim is based on revenues Griffin received *before* he terminated CAA in December, 2014.  *See* Griffin SUMF ¶ 30.  A reasonable jury could find that Dogra's interpretation of the parties' oral agreement is correct and Griffin owes 15% commissions to CAA based on all revenues he received from endorsement and marketing deals that CAA has negotiated for him and put into place for his benefit, regardless of when Griffin decided to no longer use CAA's services.

**B.      The Assignment from CAA to Dogra is Valid.**

Griffin argues that the assignment of CAA's claim to Dogra is not valid because it was the assignment of a personal services contract, and Griffin's consent is required for such an assignment.  Griffin's argument fails for two primary reasons.  First, Griffin terminated the personal services contract in December, 2014, so there was nothing for CAA to assign other than the right to collect amounts still owed.  Second, the public policy principles behind the rule against the assignment of personal services contracts do not apply here because Griffin's consent was not needed, as Griffin was the "employer" and not the "employee" within the meaning of the former personal services contract.

### 1.    No personal services contract was assigned.

First, the assignment from CAA to Dogra was simply the assignment of the right to collect a debt.  It was not, as Griffin claims, the assignment of a personal services contract.  Griffin terminated his personal services contract with CAA in December, 2014.  Memo. at 1 (noting the "oral marketing agreement between non-party CAA Sports and defendant Robert Griffin …. was terminated by Griffin in December 2014 …").  The assignment between CAA and Dogra did not take place until February, 2019.  Doc. 5-1.  At the time of the assignment, there was nothing for CAA to assign other than the right to collect from Griffin monies that were owed to CAA.  Dogra simply alleges he is the assignee of CAA's right to collect the debt owed by Griffin.  Dogra does *not* allege CAA assigned to him the right to perform personal services for Griffin; CAA had no such right at the time of the assignment.

### 2.    The Assignment is not contrary to public policy.

Second, no public policy interest prohibits the assignment.  It is undisputed that the oral agreement between CAA and Griffin *was* a personal services contract whereby CAA used its special knowledge and skill to negotiate and procure marketing and endorsement opportunities for Griffin.  Griffin was the "employer" and CAA was the "employee" in this personal services contract because CAA was performing services for Griffin in exchange for 15% commissions.

Griffin relies primarily on *Roeder v. Ferrell-Duncan Clinic, Inc.*, 155 S.W.3d 76, 84 (Mo. App. 2004) for the proposition that a contract for personal services cannot be assigned.  *Roeder* explains that the public policy of Missouri prohibits the assignment of a personal services contract without the *employee's* consent (here, the "employee" is CAA):

> One of the fundamental purposes of this state's public policy prohibiting the assignment of personal services contracts is to protect an employee's right to choose the person or entity for whom such services will be performed. Except in those limited

7

circumstances already discussed and distinguished, an employee cannot be forced, via an assignment of the contract, to provide personal services to a new employer unless the employee consents to do so.

*Roeder*, 155 S.W.3d at 89.

This public policy concern is absent in this case. There is no public policy that prohibits an employee (CAA) who has not been paid by an employer (Griffin) from assigning the right to collect that debt to a third party (Dogra). That is what happened in this case.

**3.** **The right to collect the debt owed by Griffin to CAA was assigned to Dogra because an arbitrator ruled that Dogra was entitled to collect that debt.**

Griffin next points to Dogra's testimony that CAA "could assign [the right to collect the debt] to me and me only." Memo. at 3. Griffin argues "if the assignment was of a *claim*, then it would follow that CAA Sports could have assigned the claim *to anyone*, and not solely Dogra (as he testified)." *Id.* This argument is a desperate misreading of Dogra's testimony. Dogra was simply explaining that the right to collect the debt was assignable to Dogra because the arbitrator in the dispute between CAA and Dogra awarded that claim to Dogra. Doc. 71-7, Dogra Depo. 250:4-22 (Q: "On what date did you become entitled to commissions from Robert for these endorsement deals?" A: "The date the arbitrator ruled."); *id.* at 253:6-15 (Q. "Is there a date that you know -- this is the date on which I, Ben Dogra, became entitled to these marketing commissions from Robert Griffin?" A. "So there's really two dates. …But the final date is when the arbitrator ruled on it."). Dogra's testimony is consistent with his position that the assignment was of a claim to collect a debt. The Court should reject Griffin's argument to the contrary.

**4.** **There was no "partial" assignment of the debt.**

Finally, Griffin cites *Howard Undertaking Co. v. Fidelity Life Ass'n*, 59 S.W.2d 746, 748 (Mo. App. 1933) for the proposition that "no suit may be maintained against a debtor on a partial

assignment without his consent either at law or in equity."  Memo. at 3.  He argues CAA only assigned part of its claim against Griffin to Dogra (those based on agreements predating November 13, 2014), and thus the assignment is invalid because Griffin did not consent to it.  *Id.*  This argument fails because the assignment from CAA to Dogra was not a "partial assignment."  Rather, it was a full and complete assignment of claims against Griffin arising from a specific time period. There is no overlap between the assigned claims and any claims that CAA may have retained from a different time period (i.e. the period between November 14, 2014 until Griffin's termination of the oral agreement in December, 2014).  The claims are separate and the assignment without Griffin's consent was proper.

The case relied on by Griffin, *Howard*, involved the partial assignment of a life insurance policy.  The beneficiary of the insurance policy was the decedent's father, William Nimmo.  After his daughter's death, Nimmo assigned the policy to the plaintiff, an undertaker, "to the extent of $617.00" as a means of paying the plaintiff for his daughter's funeral services.  *Id.* at 747.  The court of appeals explained that the rule against assigning part of a debt "is based on the theory that a debt cannot be split by the creditor so as to subject the debtor to separate actions thereon without his consent."  *Id.* at 748.  The court pointed out the partial assignment caused difficulties because there were still non-parties "who might be interested in the fund."  *Id.*  "The petition shows upon its face that other persons have an interest in the fund who are not in court and cannot be brought into court in this state without their consent."  *Id.*  In this case, by contrast, there are no other persons who have an interest in the debt that Griffin owes "based on agreements predating Nov. 13, 2014."  Memo. at 3.  Only Dogra has a claim to the recovery of that debt.

Decades later, the case of *Citizens and Southern Nat. Bank v. Bruce*, 420 F.Supp. 795 (D.C.Mo. 1976) illustrated the distinction between a partial assignment (such as the one that occurred in *Howard*) and the assignment of a separate claim (as here):

> Defendant argues that the work done by Contract Specialists generated only one cause of action and that a portion of the invoices issued as a result of this work could not be assigned to plaintiff without defendant's consent. …… The Court, however is unable to conclude that the work done constituted but one cause of action. The contract specified that payments were to be made monthly. Defendant received monthly bills for the services performed. Under these circumstances, the Court concludes that the claims were separate and that the assignment without defendant's consent was proper.

*Id.* at 798.

Here, as in *Bruce*, it is easy to separate the claims at issue.  Claims for the 15% commission on agreements predating November 13, 2014 were assigned to Dogra, while claims for the commission on agreements entered into by Griffin after that time period were not assigned and still belong to CAA (to the extent they exist at all).  The assignment was not a partial assignment, but rather was a full and complete assignment of a separate and easily identifiable claim.

## C.    Dogra's Claim is Not Barred by the Statute of Limitations.

Griffin argues that California law should apply to this case, and thus Dogra's claim is untimely because California has a two-year statute of limitations for contract claims.  This argument fails because Missouri law and its five-year statute of limitations should apply.  Moreover, regardless of which state's law applies, Griffin tolled the statute until 2018.

### 1.    Missouri substantive law applies to this dispute.

This case was filed on March 22, 2019.  Doc. 1.  Under Missouri law, Dogra enjoys a five-year statute of limitations for this contract action (*see* R.S.Mo. § 516.120), meaning any claims that accrued after March 22, 2014 are viable.

10

Missouri law governs the choice of law analysis in this case. *Am. Railcar Indus., Inc. v. Hartford Ins. Co. of Midwest*, 2014 WL 346047, at \*2 (E.D.Mo. Jan. 30, 2014) ("In a case where federal jurisdiction is based on diversity of citizenship, the law of the forum state is applied when deciding choice of law issues.").  In contract cases, Missouri courts use the five factors from the Restatement (Second) of Conflict of Laws to determine which state has the most significant relationship to the transaction and parties: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties." *Sturgeon v. Allied Professionals Ins. Co.*, 344 S.W.3d 205, 211 (Mo. App. 2011). These factors are to be evaluated "according to their relative importance with respect to the particular issue." *Rangeline Capital, LLC v. Preston*, 2018 WL 2321097, at \*6 (E.D.Mo. May 22, 2018).

Here, Missouri substantive law should apply to this case under choice of law principles and the Restatement's "most significant relationship" test.

First, the place of contracting and the place of negotiation of the contract was not in California as Griffin claims.  Griffin contends the Agreement was entered into in California based on a January 25, 2012 meeting he had at CAA's Los Angeles headquarters. But the evidence is clear the Agreement was formed before then. *See* Response to SUMF #9.  Griffin signed a Marketing Representation Notice with CAA earlier, on January 19, 2012, which "authorized [CAA] to seek and negotiate the marketing opportunities identified below ….."  Pltf's Ex. 2. Griffin admitted he and CAA "arrived at" the agreement on a 15% commission on endorsement and marketing deals when Griffin was in Texas, and "well before January 11th [2012]."  Doc. 71-6, Griffin Dep., 56:3 – 59:6.

11

Heligman testified that as of January 20, 2012 (five days before the Los Angeles meeting) the oral agreement was already in place.  Pltf's Ex. 1, Heligman Dep., 29:23 – 30:11 (as of January 20, 2012, "we [CAA] had agreed to [bring marketing and endorsement deals to Griffin]," and Griffin "had agreed to pay 15 percent for that work.").  Heligman had already "been working with Robert for several weeks" prior to the Los Angeles meeting.  *Id.*, 119:5-6.  He testified that at the time of the January 25 meeting in Los Angeles, "I was already secured – I had already secured Robert as a client, Ben had, and we were working on his behalf."  *Id.*, 119:10-12.  Heligman testified that the purpose of Griffin's trip to CAA headquarters on January 25, 2012 was merely to allow Griffin to see "for himself" all that CAA could provide to him, which to that point he had only heard about from Dogra, Heligman, and others. *Id.*, 30:12 – 31:2.  Indeed, in a text message produced in this case, Heligman stated that the Los Angeles meeting "was a dog and pony show, not a discussion about the terms of his marketing deal…. Those discussion[s] were handled by the football agents."  Pltf's Ex. 3, Heligman text messages, at 2.  Five days before the Los Angeles meeting occurred, Heligman emailed Griffin to say he had already "closed" several endorsement deals for Griffin. Pltf's Ex. 4, Heligman Jan. 20, 2012 email to Griffin.  Heligman testified that "closed" meant Griffin had already "agreed to the terms" of those endorsement contracts. Pltf's Ex. 1, Heligman Dep., 30:8-11.  Heligman made clear those were contracts Griffin had already agreed to enter into by January 20th. *Id.*, 28:14-29:11.

Griffin claims that Dogra "admits" the January 25, 2012 meeting in California "was held because Griffin was unsure whether to use CAA Sports as his marketing representative."  Memo. at 4.  Not so.  Dogra testified repeatedly in his deposition that Griffin had agreed to pay CAA the 15% commission on marketing deals by no later than January 19, 2012, and the meeting six days later in California was a continuation of an unsuccessful effort to get Griffin to enter into an

"exclusive" marketing agreement with CAA.  Doc. 71-7, Dogra Dep., 72:25 – 75:1; 279:16 – 280:24; 284:20 – 285:9; 288:24 – 289:7.

That the Agreement was formed *before* Griffin's trip to California makes clear the Agreement was formed in some other place than California. Thus, the "place of contracting" factor does not support Griffin's assertion about the application of California law. Similarly, "the place of negotiation of the contract", as made clear above, was not California. The Agreement was negotiated in Missouri, Texas, and, partially, Arizona.[3]

Second, the facts show the "place of performance" of the work that led to the creation of the debt at issue was performed almost entirely in Missouri.  Pltf's Ex. 1, Heligman Dep., 164:20-25 (explaining that Heligman, the primary marketing agent for Griffin at CAA, spent "90 to 95 percent" of his "time performing services for Mr. Griffin" under the Agreement in St. Louis, Missouri); *id.* at 166:8-18 (explaining "90-95 percent" of the work performed by CAA under the Agreement was done from St. Louis, Missouri).  The time Heligman spent in California on Griffin's behalf was a "small percentage" of the time he spent working under the Agreement. *Id.*, 164:15-19.

The remaining two factors also support the application of Missouri law.  First, the location of the subject matter of the oral agreement – i.e., the work done by Heligman to procure and negotiate endorsement deals for Griffin – was located in Missouri.  Pltf's Ex. 1, Heligman Dep., 166:8-18 ("ninety to 95 percent" of work completed in Missouri).  When companies paid Griffin under endorsement and marketing deals that CAA negotiated for him, those companies sent the

---

[3] Griffin testified the 15% was discussed and "arrived at" in Texas. Doc. 71-6, Griffin Dep., 57:18-19; 59:3-6.  Dogra testified he had conversations with Griffin over the telephone about the Agreement while Dogra was in Missouri and Griffin was in both Texas and Arizona. Doc. 71-7, Dogra Dep., 35:1-12.

payments to Missouri.  Doc. 71-25 at 24-29.  When Griffin terminated his oral agreement with

CAA, he sent the termination letter to CAA's office in Missouri.  Doc. 71-17 at 2.

Second, the domicile, residence, place of incorporation, and place of business of the parties

point away from California.  Griffin is a resident of Maryland, and of Texas for tax purposes.  Doc.

71-6, Griffin Dep., 7:6-10.  While CAA is headquartered in California, CAA's Football Division

was headquartered in Missouri during the time at issue in this lawsuit.  Doc. 71-7, Dogra Dep.,

33:7-11; 138:11-15.  Dogra's domicile, residence and place of business is Missouri.  At best, this

factor is a mixed bag, but it certainly does not point toward applying California law.

Application of the five factors together makes clear that Missouri has the most significant

relationship with this contract dispute.  The connection between California and this case is far less

significant than the connection with Missouri.  Missouri law (and its five-year statute of

limitations) should apply.

### 2. Griffin tolled the running of the statute of limitations.

Griffin's actions tolled the running of the applicable statute of limitations.

First, Griffin's partial payments toll the running of the statute of limitations.  On or about

April 17, 2014, Griffin paid CAA $582,501.64 for 2013 marketing and endorsement commissions.

*See* Doc. 71-16; *see also* Memo. at 5 ("Griffin paid CAA Sports …. $582,501.64 for 2013.).  This

was an acknowledgment of the debt and monies he owes to CAA under the Agreement. *See*

*Anderson v. Stanley*, 753 S.W.2d 98, 100 (Mo. App. 1988) ("Generally, part payment on a debt

tolls the statute of limitations.") (citing 54 C.J.S. Limitation of Actions § 264 (1987)).  "Such a part

payment acknowledges the existence of the indebtedness and raises an implied promise to pay the

balance." *Id.* (citing *Missouri Interstate Paper v. Gresham*, 116 S.W.2d 228, 229 (Mo. App. 1938).

Where nothing appears to show a contrary intention, the payment alone prevents the statute from

14

barring the claim. *Anderson*, 753 S.W.2d at 100 (citing *Green v. Boothe*, 188 S.W.2d 84, 89 (Mo. App. 1945). The part payment must be made under circumstances that recognize the remaining debt as existing and are consistent with an intent to pay the balance. *Anderson*, 753 S.W.2d at 100.

Further, Griffin tolled the running of the statute of limitations until at least 2018 by his attorneys' communications acknowledging that monies were owed and that precise amounts needed to be determined.  Griffin hired an attorney named Craig Gant in or around November, 2017 to "handle the collections issue" with regard to the marketing fees at issue in this lawsuit. Pltf's Ex. 1, Heligman Dep., 86:7 – 87:13; Pltf's Ex. 5.  Heligman testified that Griffin told him on two different occasions, after Griffin hired Gant, Griffin was "not looking to reduce what he owed." *Id.*, 87:15-88:6.  Even before Gant was hired, Griffin never stated he was not going to pay the outstanding fees owed to CAA under the Agreement.  Doc. 71-7, Dogra Dep., 197:2 – 198:7.

Gant acknowledged sums were owed and simply said he wanted to figure out the amount. On November 8, 2017, Gant emailed Heligman to say Griffin "ha[s] requested that I work with you and Ben [Dogra] to get to a final resolution regarding the outstanding fee issues for Agent Advisor and Marketing fee services."  Pltf's Ex. 5.  On April 10, 2018, Gant wrote to an attorney for Dogra that once he received "all the relevant information [from Griffin or his financial advisor] we will be prepared to resolve this matter. I like you would prefer this is done outside of a formal legal proceeding." Pltf's Ex. 6.  On April 27, 2018, Gant wrote he was "working diligently to gather all the relevant documentation necessary to accurately calculate the outstanding fees due pursuant to your demand." Pltf's Ex. 7.  On July 18, 2018, Dogra's attorney wrote to Gant that Dogra and CAA had agreed to collaborate on "the collection of commissions owed by Mr. Robert Griffin III," and that "this collaboration addresses your concern regarding Mr. Griffin's exposure to double payments." Pltf's Ex. 8.  On October 4, 2018, an attorney representing CAA wrote to

15

Gant: "This letter follows up on our conversation on August 28, 2018.  During that call we discussed the collection of certain marketing commissions from your client, Robert Griffin, III….During our call, *you indicated that Mr. Griffin is willing to make payment on whatever commissions he owes*, but that it was *unclear* to you whether he owed any commissions and, if so, what amounts are owed." Pltf's Ex. 9 (emphasis added). [4]

It was not until late 2018 that Griffin finally changed course and denied any sums are owed. The statute of limitations did not begin running until that point in time.

**D.      Griffin's Contract Defenses Fail.**

Griffin's remaining contract defenses all fail at the summary judgment stage because all are based on the Court accepting as true Griffin's interpretation of the terms of the oral agreement, which Dogra disputes.  Memo. at 7-13.

**1.      Dogra can prove by a preponderance of the evidence that the oral agreement was formed on the terms Dogra has alleged.**

As discussed in Section A, above, the parties disagree on the terms and scope of the oral agreement at issue in this case.  A reasonable jury could conclude that Griffin's course of performance in paying the 15% commissions in 2012 and 2013 weighs heavily toward a finding that Dogra's version of the facts is correct, and that Griffin was obligated to pay 15% commissions

---

[4] Griffin's marketing agent, Heligman, testified he is "not quite sure" what Griffin's position is in this litigation "on why he does not owe these fees." Pltf's Ex. 1, Heligman Dep., 86:21-23. Heligman testified that Griffin admitted he owes the roughly $700,000.  *Id.*, 88:7-12; 89:1-5. When Griffin hired attorney Gant in connection with the collection of the roughly $700,000 at issue in this lawsuit, Heligman recounted discussing the hiring with Griffin as follows: "I wanted to confirm with [Griffin] that he was not going to try to cut these fees and reduce the amount that he owed. And he assured me that that was not the case. And I expressed that to him on two occasions, and both times he assured me that's not what this was about. He was not looking to reduce what he owed."  *Id.*, 87:22 – 88:3 (emphasis added).

to CAA on the marketing and endorsement revenue he received, whether or not CAA succeeded in securing him a book deal or making him a Hollywood movie star.

Griffin cites the Declaration of Mark Heligman as evidence that CAA "agreed to provide Griffin with the much broader Services" which includes securing book deals and Hollywood acting gigs. Memo. at 9; Doc. 71-8, ¶ 8. However, as discussed in Section A.1 above, Heligman testified that CAA was entitled to the 15% commission on endorsement and marketing revenue whether or not it was able to successfully perform the other "services" discussed with Griffin. Pltf's Ex. 1, Heligman Dep., 115:4-10. Heligman testified the terms of the oral agreement were simple: "the 15 percent is owed if [Griffin] gets paid….if he gets paid, he owes the fee." *Id.*, 168:21-24.

Heligman was questioned in his deposition about the process by which Griffin obtained the declaration from him. *Id.*, 33:12-58:19. Griffin sent multiple drafts of the declaration to Heligman over text message. *Id.,* 44:13-15. At least one draft included a paragraph that stated: "The Agreement, which is not in writing, was negotiated and formed by Mr. Griffin and CAA Sports in California." *Id.*, 43:12-20. Heligman testified he "did not agree" this statement "was accurate," so it did not end up in the final version of the declaration. *Id.* In other words, Heligman's sworn testimony is that the Agreement was *not* negotiated and formed in California. *See id.* Similarly, Griffin asked Heligman to include the statement: "There was no agreement between Mr. Griffin and CAA Sports prior to the January 25th meeting in Los Angeles." *Id.*, 43:21-24. Heligman felt that statement was also not accurate, and therefore he insisted it not be included in his declaration. *Id.*, 43:25-44:4. Heligman told Griffin that both of the foregoing statements were incorrect. *Id.*, 46:4-17. And, as Heligman testified, he was present in Los Angeles for the January 25 meeting and witnessed the "vast majority" of everything that happened there. *Id.*, 47:6-13.

Griffin also cites the deposition testimony of Michael Levine, a CAA executive, in support of his argument that at the Los Angeles meeting, CAA promised to "provide Griffin with the much broader Services" before it became entitled to collect any commissions.  Memo. at 9.  But Levine testified that the Los Angeles meeting was "definitely after" Griffin "had joined" CAA. Doc 71-9, Levine Dep., 12:15-13:3.  Levine "let [Griffin] know how excited we [CAA] were to be working together and how I would do whatever I could to be helpful to him." *Id.*, 13:22-14:3.  Levine remembered simply "feeling excited for CAA Sports to be working with such an exciting player at that time." *Id.*, 15:13-24.

A jury should hear the testimony of Griffin, Heligman and others and should be asked to settle the parties' dispute over the core facts of this case.

### 2.     Whether the Agreement was terminable at will has no bearing on whether Griffin is obligated to perform his end of the oral agreement.

Griffin argues, without citing any authority, that "[b]ecause Griffin terminated CAA Sports in December, 2014, he cannot be liable for any commissions based upon fees generated by him in 2015 or 2016."  Memo. at 10.  But this is precisely what the oral agreement required.  As clearly alleged in the First Amended Complaint, the oral agreement was that Griffin would pay the 15% commission to CAA on revenue he received from deals that were "negotiated prior to the termination or expiration of the Agreement."  Doc. 5, ¶ 10.  The First Amended Complaint further alleges that Griffin agreed "to pay fees on his or her earnings already received, or to be received in the future, for the duration of any employment that began, was agreed to, or that was substantially negotiated, while the agent (i.e. Dogra) performs services for the talent."  *Id.*

In other words, after he terminated the oral agreement with CAA in December, 2014, Griffin was free to enter into new deals with outside companies that would generate revenue for Griffin, and he would not owe CAA commissions on those deals as long as the deals were not

"renewals, replacements, modifications, or amendments of agreements negotiated [by CAA] prior to the termination or expiration of the Agreement." *Id.* Thus, despite Griffin's claim to the contrary, the evidence will show that he and CAA did have an agreement regarding post-termination commissions on deals that fit the description above. This is a fact dispute that cannot be resolved on summary judgment.

Dogra alleges the arrangement described in the Complaint "is industry standard, and commonly understood." *Id.* Griffin's own current marketing agent, Heligman, agreed. Pltf's Ex. 1, Heligman Dep., 9:13 – 11:2. Heligman testified that the agreement described in paragraph 10 of the First Amended Complaint is how the arrangement worked not only for Griffin, but also for other professional athletes with whom Heligman has worked. *Id.* This is fact testimony rather than expert testimony. Heligman's testimony should be admissible at trial to explain the terms of the oral agreement between CAA and Griffin. *See, e.g.*, *Essco Geometric v. Harvard Industries*, 46 F.3d 718, 726–27 (8th Cir. 1995) (approving the admission of non-expert testimony of third parties to show "industry custom" regarding an employee's authority to bind an employer, and holding "the evidence and inferences therefrom led to differing conclusions, and were matters for resolution by the jury."). Here, there is no "ambiguous contract provision" to be interpreted as a matter of law. Rather, there is a fact dispute concerning the terms of an oral marketing agreement. That issue is a question of fact for the jury to be resolved on proper instructions.

### 3. Griffin is not entitled to summary judgment based on his claim for an "offset" of amounts retained by CAA in 2015 and 2016.

Griffin argues he is entitled to an "offset and credit" for commissions taken by CAA in 2015 and 2016 "[b]ecause Griffin is not liable for 2015 and 2016 commissions given his December 2014 termination of the agreement[.]" Memo. at 11. Griffin's liability for 2015 and 2016

commissions is disputed, as described herein.  Summary judgment is not warranted on this issue because a jury should decide Griffin's liability for those commissions.

> **4.      Griffin agreed to pay CAA a 15% commission on marketing and endorsement deals that CAA negotiated and secured for Griffin, even if the revenues were received by Griffin post-termination.**

Griffin argues he "never agreed, expressly or otherwise, to pay commissions to CAA Sports on fees generated by him after termination of the agreement."  Memo. at 12.  For the same reasons stated in Section D.2 above, this is a fact dispute that cannot be resolved on summary judgment.

> **5.      The oral agreement is not barred by the statute of frauds.**

Next, Griffin argues that Dogra's claim to commissions on revenues received by Griffin after he terminated the oral agreement in December, 2014 is barred by the statute of frauds.  Memo. at 13.  Griffin's statute of frauds argument fails because the oral agreement at issue here was not, as Griffin claims, "an oral contract for employment for more than one year."  Memo. at 13.  Rather, the contract was terminable at will (as Griffin acknowledges, *see* Memo. at 9-10), and thus could be wholly performed within a year or even a day.  The oral agreement is therefore not within the statute of frauds.

In Missouri, "[a] contract which is not expressly to run for a period longer than a year and is terminable at will, or on less than a year's notice, is not within the statute of frauds, since by exercise of the option to terminate it may be wholly performed within the year, and this rule applies although the contract is of a continuing nature, and, in fact, has extended for more than a year."  *Fry v. Accent Mktg. Services, L.L.C.*, 4:13CV59 CDP, 2013 WL 2403669, at *4 (E.D.Mo. May

31, 2013) (citations omitted).[5]  An unwritten contract is valid and "not barred by the Statute of Frauds if it can hypothetically be performed within a year, 'no matter how fanciful the possibility of performance may be.'"  *Grantham v. Wal-Mart Stores, Inc.*, 2012 WL 12898187, at *2 (W.D.Mo. 2012) (citing *Visiting Nurse Ass'n, St. Louis v. VNAHealthcare, Inc.*, 347 F.3d 1052, 1055 (8th Cir. 2003) and *Crabb v. Mid-Am. Dairymen, Inc.*, 735 S.W.2d 174, 715-16 (Mo. banc 1987)); s*ee also State Auto Prop. & Cas. Ins. Co. v. Loehr*, 2008 WL 4449449, at *7 (E.D.Mo. Sept. 26, 2008) (noting that "Missouri follows the 'familiar rule' that any contract that can hypothetically be performed within a year is outside of the statute of frauds, "no matter how fanciful the possibility of performance may be.").  Indeed, an unwritten contract "is not unenforceable under the statute of frauds if it could possibly be performed in compliance with its terms within one year, even though the actual performance is expected to continue over a much longer period." *Bailey v. Hawthorn Bank*, 382 S.W.3d 84, 98 (Mo. App. 2012) (citing *Crabb*, 735 S.W.2d at 716 and *Want v. Century Supply Co.*, 508 S.W.2d 515, 516 (Mo. App. 1974) ("[T]he possibility that a contract may be performed within one year is sufficient to avoid the statute of frauds.")).  Here, it is hypothetically possible that the oral agreement could have been performed within one year if, for example, CAA had procured one discrete endorsement deal for Griffin and then he immediately terminated.

Finally, Griffin cites *Levine v. Zadro Products, Inc.*, 2003 WL 21344550, at *5 (S.D.N.Y. 2003) for the proposition that an oral agreement for post-termination commission payments cannot be performed within one year and is unenforceable.  This case applied New York law and does

---

[5] Missouri's Statute of Frauds states: "No action shall be brought to charge ... upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith...."  R.S.Mo. § 432.010.

nothing to counter the Missouri authority cited above.  Indeed, under Missouri law, the statute of frauds is no defense where a plaintiff has fully performed under the contract.  *See Aly v. Hanzada for Imp. & Exp. Co., LTD*, 864 F.3d 844, 850–51 (8th Cir. 2017) ("the great weight of authority supports the rule that the statute of frauds has no application where there has been a full and complete performance of the contract by one of the contracting parties, and the party so performing may sue on the contract in a court of law.") (citations omitted); *see also Kimberlin v. C.M. Brown and Associates, Inc.*, 722 S.W.2d 90, 90–91 (Mo. App. 1986) ("Unlike the cases relied upon by defendant, plaintiff did not here seek to recover on an executory contract. He sought only to recover compensation for fully performed work. In that situation the Statute of Frauds has no application.") (citing *Wills v. Alcorn*, 636 S.W.2d 142 (Mo. App. 1982) and *Holt v. Story*, 642 S.W.2d 394 (Mo. App. 1982)).

In this case, there is no evidence in the summary judgment record on which the Court could find as a matter of law that CAA failed to render full and complete performance of the contract. In fact, Heligman testified that he worked hard on Griffin's behalf starting in January, 2012 and going through Griffin's termination of the oral marketing agreement in December, 2014.  Pltf's Ex. 1, Heligman Dep., 79:6-10.  Heligman specifically remembered doing work for Griffin under the Agreement in November 2014.  *Id*., 82:12-24.  He was "was doing a lot" for Griffin in 2014. *Id.*, 147:16-17.  About the end of 2014, Heligman testified: "I knew I was doing a great job for [Griffin]. I felt like he appreciated me and wanted me to continue to represent him."  *Id*., 152:22-24. CAA's full performance takes the oral contract outside the statute of frauds.

**E.    Dogra has made a submissible claim for breach of the covenant of good faith and fair dealing.**

Griffin claims he is entitled to summary judgment on Count II of the Complaint because he has proved "there was no agreement between Griffin and CAA Sports to pay commissions after

termination."  Memo. at 14-15.  This argument fails for the same reasons stated in sections A.2

and D.2 above.  There is a fact dispute on that very question, and Dogra has introduced evidence

that there was, in fact, such an agreement.  The jury must resolve this fact dispute after hearing the

evidence and weighing the witnesses' credibility.

**F.   Dogra has made a submissible claim for unjust enrichment in the event the oral agreement is found to be invalid and unenforceable.**

"To establish the elements of an unjust enrichment claim, the plaintiff must prove that (1)

he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the

defendant accepted and retained the benefit under inequitable and/or unjust circumstances."

*Boswell v. Panera Bread Company*, 2016 WL 1161573, at *16 (E.D.Mo. 2016).  "The essence of

unjust enrichment is that the defendant has received a benefit that it would be inequitable for him

to retain."  *Id.* (citations omitted).

Griffin claims that he is entitled to summary judgment on Count III of the Complaint

because "the unjust enrichment claim is based upon 'the Agreement' governing the same subject

matter" and thus "Dogra is precluded from recovery on an unjust enrichment theory."  Memo. at

15.  This is not the law.  The law is that on an unjust enrichment claim, "the existence of a *valid

and enforceable* contract governing the subject matter at issue ordinarily precludes recovery for

events arising out of the same." *Dubinsky v. Mermart LLC*, 2009 WL 1011503, at *5 (E.D.Mo.

2009) (emphasis added) (citing *In re Express Scripts, Inc., PBM Litigation*, 522 F.Supp.2d 1132,

1148 (E.D.Mo. 2007).[6]  A plaintiff is "certainly entitled to bring an unjust enrichment claim as an

alternative ground for relief."  *Id.* (citing *Howard v. Turnbull*, 258 S.W.3d 73, 76 (Mo. App. 2008);

---

[6] In *Dubinsky*, neither side took the position the underlying contracts between the parties were invalid or unenforceable.  Here, by contrast, Griffin asserts the oral agreement is unenforceable pursuant to the statute of frauds.

*see also Prime Aid Pharmacy Corp. v. Express Scripts, Inc.*, 2017 WL 2021082, at *6 (E.D.Mo. 2017) ("the fact that a plaintiff cannot simultaneously recover damages for both breach of an express contract and unjust enrichment does not preclude that plaintiff from pleading both theories in its complaint.").

Here, Griffin alleges the oral agreement at issue in this case is <u>*not valid and enforceable*</u> by reason of the statute of frauds. Missouri courts expressly allow unjust enrichment claims and other quasi-contract claims to go to the jury if the statute of frauds renders the contract unenforceable. *Boswell*, 2016 WL 1161573, at *17 ("if a contract is unenforceable by reason of the statute of frauds, the party who has performed can recover the value of his performance on the theory of quasi-contract, since otherwise he would be left without remedy.") (citing *Consol. Products Co. v. Blue Valley Creamery Co.*, 97 F.2d 23, 27 (8th Cir. 1938). Thus, if Griffin succeeds in his attempts to evade Dogra's breach of contract claim under the statute of frauds defense (he should not), then the Court will have found the oral agreement is unenforceable and invalid. In that case, Dogra's unjust enrichment claim should be submitted to the jury to ensure Dogra is not left without a remedy. *Boswell*, 2016 WL 1161573 at *17 (holding plaintiffs "have presented sufficient evidence to survive summary judgment on their unjust enrichment claim.").

A jury must decide whether Dogra (standing in the shoes of CAA as an assignee) conferred a benefit on Griffin that it would be inequitable for Griffin to retain. Here, there is no dispute that Griffin received over $4.9 million in revenue from marketing and endorsement deals that CAA negotiated and procured for Griffin. Doc. 71-25, at 3. The vast majority of that revenue was paid to Griffin in 2014 *prior* to his December 2014 termination of the oral agreement with CAA. *Id.* Griffin has not paid a penny of commission on that revenue to anyone. It is unjust for Griffin to accept the benefits of CAA's work without paying the agreed upon 15% commission.

## Conclusion

Griffin entered the Agreement with CAA and agreed to pay CAA 15% of the monies he earned under the contracts CAA procured for him. Griffin is in breach of the Agreement because he has failed to pay over $700,000 in commissions. His alleged defenses fail.  Griffin must pay what he owes under the Agreement.

Dated: March 19, 2020                                 Respectfully submitted,

**DOWD BENNETT LLP**

By:  /s/ John D. Comerford
John D. Comerford, MO #60164MO
James B. Martin, MO #70219MO
7733 Forsyth Blvd., Suite 1900
St. Louis, MO 63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111
jcomerford@dowdbennett.com
jbmartin@dowdbennett.com

*Attorneys for Plaintiff Rakshpal ("Ben") Dogra*

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2020, the foregoing document was filed electronically with the Clerk of Court and served by operation of the Court's electronic filing system upon all counsel of record in this case participating in Electronic Case Filing.

 /s/ John D. Comerford

*Attorneys for Plaintiff Rakshpal ("Ben") Dogra*